1

2

3

4

5

6

7

8               IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   WILLIAM RENNIE, III,

11              Petitioner,              2: 09 - cv - 698 - WBS TJB

12        vs.

13   MICHAEL MARTIN,

14              Respondent.        FINDINGS AND RECOMMENDATIONS

15   _____/

16        Petitioner, William Rennie, III, is a state prisoner proceeding with a counseled petition for

17   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner is currently serving a sentence of

18   ten years in prison after a jury convicted him of three counts of lewd and lascivious acts with a

19   child under the age of 14.  Petitioner raises two claims in this federal habeas petition;

20   specifically: (1) the nearly eight year delay between the time the information was filed and

21   Petitioner was brought to trial violates his right to a speedy trial ("Claim I"); and (2) trial

22   counsel's failure to send a letter to the District Attorney confirming the District Attorney's intent

23   to dismiss the case amounted to ineffective assistance of counsel ("Claim II").  For the reasons

24   stated herein, the federal habeas petition should be denied.

25   / / /

26   / / /

## I.  FACTUAL BACKGROUND[1]

Given the nature of defendant's claims on appeal, a detailed description of the underlying offenses is unnecessary.  Suffice it to say that in 1996, defendant orally copulated Kimberly R. on multiple occasions, attempted to fondle Kimberly's sister, Sheila R., and inappropriately touched another young girl, Tanya N.

Prosecution of this case came to a standstill from 1998 to 2004 while defendant was incarcerated in Oregon.

## II. PROCEDURAL HISTORY AND ADDITIONAL BACKGROUND

On August 26, 1997, an information was filed in case number 58669, in Nevada County Superior Court, charging Petitioner with seven counts of violation of California Penal Code section 288(a), lewd and lascivious act with a child under the age of 14.  Lodged Doc. No. 3 (Clerk's Transcript on Appeal), at 8.  Petitioner was released on bail, and was subsequently arrested on October 3, 1997, after a court appearance in the California case which is the subject of this petition, on an arrest warrant arising from separate conduct in Oregon.  *Id.* at 13.  On January 9, 1998, Petitioner filed a motion to continue his trial, and on March 6, 1998, noting that Petitioner was incarcerated in Oregon, the Superior Court vacated the trial date.  *Id.* at 17.  According to the Clerk's transcript, nothing occured in the case for the next six years.  *See id.* at 18.

In support of Petitioner's writ of habeas corpus filed in Nevada County Superior Court, Petitioner submitted the declaration of his trial attorney, Stephen Munkelt, which set forth the discussions between Mr. Munkelt and the District Attorney's office during the time Petitioner was incarcerated in Oregon.  *See* Pet'r's Pet., ECF No. 2, Ex. G (hereinafter "Munkelt Decl.").  Because Respondent offered no evidence to controvert the declaration, the state court accepted its content as true.  *See* Lodged Doc. No. 10 (Writ of Habeas Corpus Transcript of Proceeding), at

---

[1]  The factual background is taken from the California Court of Appeal, Third Appellate District decision on direct appeal from July 2006 and filed in this Court by Respondent on May 12, 2009 as Exhibit A to his answer (hereinafter referred to as the "Slip Op.").

35.

According to the declaration, between 1998 and 2001Munkelt spoke on numerous occasions with Julie McManus, the prosecutor handling Petitioner's case.  Munkelt Delc. at ¶ 3. In either 1999 or 2000, Munkelt urged McManus to either dismiss the charges or bring Petitioner back for trial.  *Id.*  At some point McManus told Munkelt that she "intended to dismiss the case, in part due to the passage of time."  *Id.*; *see also* Aff. of William Rennie III (hereinafter "Rennie Aff."), attached to Lodged Doc. No. 12 at ¶ 9.  In reliance on this statement, Munkelt ceased investigation and preparation of Petitioner's defense.  Munkelt Delc. at ¶ 4.  McManus never formally dismissed the case before she left the District Attorney's office in or about 2001 and the case was reassigned to Charles O'Rourke.  *Id.* at ¶¶ 3-4.  Munkelt told O'Rourke about McManus' representation that she intended to dismiss the case, and asked O'Rourke to dismiss the case on a few occasions.  *Id.* at ¶ 4.  On May 22, 2001, Munkelt sent O'Rourke a letter, later relied on by the Superior Court, which stated as follows:

> Dear Mr. O'Rourke,
>
> I spoke with you last week about Mr. Rennie's old 288 case, which was being prosecuted by Ms. McManus several years ago.  Mr. Rennie has been in prison in Oregon for the last three years or so, and in my most recent discussion with Julie, she indicated that she had decided to drop the local matter, due in part to the passage of time.
>
> The reason for contacting you is that Mr. Rennie has told me Nevada County still has a "hold" on him at the Oregon prison.  My guess is that you or your office heeds [sic] to take action to cancel the warrant or other notice that creates this hold.
>
> I know that your records include a dizzying array of "Rennie" matters, but when you have a few minutes to identify the correct case, we would appreciate action to wind the matter up.  Thank you for your assistance.

Lodged Doc. No. 3 (Clerk's Transcript on Appeal), at 33.[2]

---

[2]  Unlike Munkelt's declaration, which was made just before Petitioner filed his first habeas petition in state court, his letter to Mr. O'Rourke was part of the transcript of Petitioner's

During this time period, Munkelt spoke to Petitioner on multiple occasions, advising him that the prosecution intended to dismiss the case and that he should not file documents pursuant to the Interstate Agreement on Detainers, which would force the prosecution to either dismiss the case or bring him to trial within a certain amount of time. *Id.* at ¶ 5; *see also* Rennie Aff. at ¶ 10; note 8, *infra*. This advice was based on Munkelt's impression that the case was going to be dismissed, which was based primarily on McMansus' statement. Munkelt Delc. at ¶ 5. Munkelt continued to follow up periodically with O'Rourke and shortly before Petitioner's release from prison in Oregon, O'Rourke informed Munkelt that he would not dismiss the case, and intended to prosecute Petitioner. Munkelt Decl. at ¶ 4.

On March 17, 2004, Petitioner filed a motion to dismiss the charges, alleging that his right to a speedy trial guaranteed by the Sixth Amendment had been violated. *Id.* at 18-24. That motion, as well as two renewed motions filed thereafter, was denied by the Superior Court. *Id.* at 41, 132, 247. During this time period, Petitioner's counsel filed three motions to continue the trial, at least one of which was opposed by the prosecution. *Id.* at 51, 59, 90. Finally, on March 14, 2005, trial began. *Id.* at 247.

The jury found Petitioner guilty on three counts and, after rejecting Petitioner's motion for a new trial, the court sentenced Petitioner to an aggregate term of twelve years in state prison. *Id.* at 252, 374, 392, 401.

Petitioner appealed his conviction to the California Court of Appeal, Third District, reasserting his speedy trial claim as well as a claim for ineffective assistance of counsel, and other claims not pertinent to this habeas petition. *See* Lodged Doc. No. 5 (Appellant's Opening Brief). In July, 2006, the Court of Appeal, in a reasoned decision, affirmed Petitioner's conviction. Slip Op. Petitioner filed a petition for review in the California Supreme Court, which was denied on October 18, 2006. Lodged Doc. No. 9 (Order Denying Review). Petitioner

original trial. It was first filed as an exhibit to the People's opposition to Petitioner's first motion to dismiss on speedy trial grounds. *See* Lodged Doc. No. 3, at 18.

4

did not seek a writ of certiorari from the United States Supreme Court.

In January, 2008, Petitioner filed a petition for habeas corpus in Nevada County Superior Court.  Lodged Doc. No. 12 (California Superior Court Habeas Petition).  Petitioner again raised his speedy trial and ineffective assistance of counsel claims, as well as several other grounds for relief not relevant to this petition, including a claim pursuant to *Cunningham v. California*, 549 U.S. 270 (2007).  The court held a hearing on the matter and, ruling from the bench, denied all of Petitioner's claims except for his claim under *Cunningham*, for which the court reduced Petitioner's sentence from twelve years to ten.  Lodged Doc. No. 10 (Writ of Habeas Corpus Transcript of Proceeding); Lodged Doc. No. 11 (Further Sentencing Proceeding (Partial Trial)).  Petitioner then filed an original petition for habeas corpus in the California Court of Appeal, Third District.  Lodged Doc. No. 14 (California Court of Appeal Habeas Petition and Denial Order).  The court summarily denied the petition, as did the California Supreme Court.  *Id.*, Lodged Doc. No. 15 (California Supreme Court Petition and Denial Order).

One day after the California Supreme Court denied Petitioner relief, he filed the instant petition for writ of habeas corpus in United States District Court.

## III.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can only be granted for violations of the Constitution or laws of the United States.  *See* 28 U.S.C. § 2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985), *citing Engle v. Isaac*, 456 U.S. 107, 119 (1982).  Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies.  *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in the state court proceedings unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2)

1   resulted in a decision that was based on an unreasonable determination of the facts in light of the

2   evidence presented in state court.  *See* 28 U.S.C. § 2254(d); *Perry v. Johnson*, 532 U.S. 782, 792-

3   93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000).

4          In applying AEDPA's standards, the federal court must "identify the state court decision

5   that is appropriate for our review."  *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005).

6   "The relevant state court determination for purposes of AEDPA review is the last reasoned state

7   court decision."  *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008) (citations omitted).

8   "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained

9   orders upholding that judgment or rejecting same claim rest upon the same ground."  *Ylst v.*

10  *Nunnemaker*, 501 U.S. 797, 803 (1991).  To the extent no such reasoned opinion exists, courts

11  must conduct an independent review of the record to determine whether the state court clearly

12  erred in its application of controlling federal law, and whether the state court's decision was

13  objectively unreasonable.  *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000). "The

14  question under AEDPA is not whether a federal court believes the state court's determination

15  was incorrect but whether that determination was unreasonable—a substantially higher

16  threshold."  *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007), *citing Williams*, 529 U.S. at 410.

17  "When it is clear, however, that the state court has not decided an issue, we review that question

18  *de novo*."  *Reynoso v.Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006), *citing Rompilla v. Beard*,

19  545 U.S. 374, 377 (2005).

20                          IV.  TIMELINESS OF PETITION

21         Pursuant to AEDPA, a state prisoner who wishes to challenge his or her conviction in

22  federal court is faced with a one-year statute of limitations.  28 U.S.C. § 2244(d)(1).  The one-

23  year statute of limitations period begins to run from the latest of:

24         (A)    the date on which the judgment became final by the conclusion of direct
                  review or the expiration of the time for seeking such review;

25

26         (B)    the date on which the impediment to filing an application created by State
                  action in violation of the Constitution or laws of the United States is

6

1         removed, if the applicant was prevented from filing by such State action;

2     (C)     the date on which the constitutional right asserted was initially recognized
                by the Supreme Court, if the right has been newly recognized by the
3                 Supreme Court and made retroactively applicable to cases on collateral
                review; or
4

5     (D)     the date on which the factual predicate of the claim or claims presented
                could have been discovered through the exercise of due diligence.

6 *Id.* § 2244(d)(1)(A-D).

7        The statute of limitations is tolled so long as the state prisoner has a pending "properly

8 filed application for State post-conviction or other collateral review with respect to the pertinent

9 judgment or claim." *Id.* § 2244(d)(2). In order for an application to be "properly filed," it must

10 be timely: "When a postconviction petition is untimely under state law, 'that [is] the end of the

11 matter' for purposes of § 2244(d)(2)." *Pace v. DiGuglielmo*, 544 U.S. 408, 414 (2005), *quoting*

12 *Carey v. Saffold*, 536 U.S. 214, 226 (2002); *see also Carey*, 536 U.S. at 236 (Kennedy, J.,

13 dissenting) ("If the California court held that all of [the state prisoner's] state habeas petitions

14 were years overdue, then they were not 'properly filed' at all, and there would be no tolling of the

15 federal limitations period.").

16        Furthermore, the statute of limitations remains tolled during the intervals between a state

17 court's disposition of a state habeas petition and the filing of a petition at the next state appellate

18 level, so long as the subsequent petition is timely. *Carey*, 536 U.S. at 220-21; *see also Nino v.*

19 *Galaza*, 183 F.3d 1003, 1006 (9th Cir. 1999), *cert. denied*, 529 U.S. 1104 (2000); *Taylor v. Lee*,

20 186 F.3d 557 (4th Cir. 1999); *Barnett v. Lemaster*, 167 F.3d 1321, 1323 (10th Cir. 1999); *but see*

21 *Evans v. Chavis*, 546 U.S. 189 (2006) (holding that a delay of more than three years between the

22 petition being denied by the California Court of Appeal and the filing of a petition for review in

23 the California Supreme Court was untimely and could not be used to toll AEDPA's statute of

24 limitations). For petitions arising in California,[3] "the statute of limitations is tolled from the time

25 

26     [3] Unlike most states, California does not require petitioners to seek review of an adverse
lower court decision within a specified time period. Instead, petitioners must file an original

1  the first state habeas petition is filed until the California Supreme Court rejects the petitioner's

2  final collateral challenge."  *Nino*, 183 F.3d at 1006 (footnotes omitted).

3      In the present action, Respondent challenges the timeliness of Petitioner's federal habeas

4  petition on two separate grounds.  First, that Petitioner's state court habeas petitions were not

5  timely filed, and, therefore, cannot be used to toll AEDPA's statute of limitations.  Second, that

6  even if the period for which Petitioner had a pending state court habeas action pending is tolled,

7  Petitioner has still failed to file his federal habeas petition within the one-year statute of

8  limitations because Petitioner lacks proof of the date which his initial state habeas petition was

9  filed in California Superior Court.

10      A.  Timeliness of Petitioner's Initial State Petition

11      Respondent contends, for the first time in this court, that Petitioner's initial petition for

12  habeas corpus, filed nearly one year after his conviction became final, is untimely.  Petitioner

13  argues that either Respondent has waived his opportunity to object to the timeliness of the initial

14  petition, or, in the alternative, that the petition was in fact timely.

15      As an initial matter, it is unclear whether it is proper for a federal court to inquire into the

16  timeliness of an *initial* state court habeas petition where the initial petition was reviewed on the

17  merits by the state court without addressing the timeliness of the petition.  To the extent that

18  Respondent relies on *Evans v. Chavis*, *supra*, in supporting a review of the timeliness of

19  Petitioner's initial state court petition, *Evans* is inapplicable.  *Evans*, and the cases interpreting it,

20  deal not with the timeliness of an initial state court petition but rather with the timeliness of any

21  appeals[4] from the initial decision and whether the gap between the denial of the initial petition

22  _____

23  petition in the appellate court within a "reasonable time."  *See Carey*, 536 at 219-23; *Evans*, 546
    U.S. at 192-93 (summarizing *Carey*); *see also Nino*, 183 F.3d at fn. 2.

24      [4] Here the term "appeal" is used loosely.  Under California's unusual system of
25  habeas review, "there is no way for a prisoner seeking post-conviction relief to formally appeal a
    lower court's decision."  *Maxwell v. Roe*, 628 F.3d 486, 495 (2010), *citing Carey*, 546 U.S. at
26  221.  "Instead, each level of the California court system has original jurisdiction over habeas
    petitions" and petitioners seeking review of the denial of a petition in a lower court must file an

1   and the filing of the appeal should be considered part of the pending state court action for

2   purposes of tolling AEDPA's statute of limitations.  *See Evans*, 546 U.S. at 189 (considering the

3   timeliness of the petitioner's petition for review in the California Supreme Court); *Chaffer v.*

4   *Prosper*, 592 F.3d 1046 (9th  Cir. 2010) (considering gap between denial of habeas petition in

5   the Superior Court and filing of petition in the Court of Appeal as well as gap between that Court

6   of Appeal's denial and the filing of a petition for review with the California Supreme Court); *see*

7   *also Sanchez v. Yates*, 2008 WL 4454109, at *2 (E.D. Cal. 2008)  ("*Whenever* a petitioner

8   properly files a state collateral review pleading within the federal statute of limitations period,

9   federal statutory tolling commences at that time.  It is only when *subsequent* petitions are tardily

10  filed does *Evans v. Chavis* come into play." (emphasis in original)).  Respondent has cited no

11  authority where a federal court has inquired into the timeliness of a petitioner's initial state

12  habeas filing where the state court reached a decision on the merits without addressing the

13  timeliness of the petition.  *Cf. Pace*, 544 U.S. at 412-13 (holding that a finding by the state court

14  that an initial petition is untimely precludes tolling of AEDPA's statute of limitations); *Bonner*,

15  425 F.3d at 1148-49 ("Because the California courts dismissed Bonner's [initial] petition as

16  untimely, his petition was not 'properly filed' under AEDPA.").

17          Assuming that this court should inquire into the timeliness of an initial state petition

18  when the state court did not find the petition untimely and reached the merits of Petitioner's

19  claims, Petitioner's petition was timely under California law.  California does not employ fixed

20  statutory deadlines to determine the timeliness of a state prisoner's petition for habeas corpus.

21  Instead, California directs petitioners to file known claims "as promptly as the circumstances

22  allow."  *In re Clark*, 5 Cal.4th 750, 765, n. 5, 21 Cal.Rptr.2d 509, 855 P.2d 729, 738, n. 5 (1993).

23  Petitioners are further instructed to state when they first learned of the asserted claims and to

24

25  _____

26  original petition with a higher court.  *Id.*; *see also Evans*, 546 U.S. at 192-93 (discussing the
    California system and concluding that it is sufficiently analogous to that of other states appellate
    review practices).

9

1   explain why they did not seek postconviction relief sooner.  *In re Robbins*, 18 Cal.4th 770, 780,

2   77 Cal.Rptr.2d 153, 959 P.2d 311, 317-318 (1998).  Claims substantially delayed without

3   justification may be denied as untimely.  *Id.*; *Clark*, 5 Cal.4th, at 765, n. 5.  California courts

4   "appl[y] a general 'reasonableness' standard" to judge whether a habeas petition is timely filed.

5   *Walker v. Martin*, __ U.S. __, 131 S.Ct. 1120, 1125 (2011) (quoting *Carey*, 536 U.S. at 222).

6          Three leading decisions describe California's timeliness requirement: *Robbins*, *Clark*, and

7   *In re Gallego*, 18 Cal.4th 825, 77 Cal.Rptr.2d 132, 959 P.2d 290 (1998). A prisoner must seek

8   habeas relief without "substantial delay," *Robbins*, 18 Cal.4th, at 780; *Gallego*, 18 Cal.4th, at

9   833; *Clark*, 5 Cal.4th, at 783,, as "measured from the time the petitioner or counsel knew, or

10  reasonably should have known, of the information offered in support of the claim and the legal

11  basis for the claim," *Robbins*, 18 Cal.4th, at 787.[5]  Petitioners in noncapital cases have "the

12  burden of establishing (i) absence of substantial delay, (ii) good cause for the delay, or (iii) that

13  the claim falls within an exception to the bar of untimeliness."  *Id.* at 780.  California's

14  timeliness requirement, while not coined in precise terms, is clear and consistently applied such

15  that a finding of untimeliness by a California state court is an adequate procedural bar to seeking

16  habeas relief in federal court.  *Martin*, 131 S.Ct. at 1129.

17         Petitioner filed his initial state habeas petition in Nevada County Superior Court on

18  January 12, 2008[6]—nearly one year after his conviction became final.  *See* Lodged Doc. No. 12

19  (California Superior Court Habeas Petition); Lodged Doc. No. 9 (California Supreme Court

20  Order Denying Review).  The petition does not allege with specificity any facts which would

21  entitle him to a finding that he filed his petition without substantial delay or that there was good

22  ──────────────

23         [5]  Respondent argues that the habeas petition is presumptively untimely if it is not filed
     within 90 days of the petitioner's opening brief on direct appeal.  This requirement only applies
24  to capital cases.  *See Martin*, 131 S.Ct. at 1125, n. 1.

25         [6]  Respondent takes issue with the date upon which Petitioner's initial state habeas
     petition was filed, arguing that it was actually filed sometime later then January 12, 2008.  This is
26  discussed more fully in section III, B., *infra*, and does not affect the court's reasoning with regard
     to the timeliness of Petitioner's initial state-court petition under California law.

cause for such delay.  *See* Lodged Doc. No. 12.  Of course, Petitioner was not forced to do so in the Superior Court as Respondent made no objection to the timeliness of the petition, and the court reached the merits of Petitioner's claims without commenting upon the petition's timeliness.  *See* Lodged Doc. No. 10 (Writ of Habeas Corpus Transcript of Proceeding); Lodged Doc. No. 13 (Nevada County District Attorney Memorandum in Opposition to Petition for Writ of Habeas Corpus); *see also In re Robbins*, 18 Cal.4th at 779 (respondent raised timeliness issue in its informal response to the petition).  Because the question of the timeliness of an initial petition is fact based and determined by a reasonableness standard, it "should have been raised below so that the court which sanctioned the delay could address it in the first instance." *In re Sodersten*, 146 Cal. App. 4th 1163, 1222, 53 Cal.Rptr.3d 572  (2007).  Respondent's failure to challenge the timeliness of Petitioner's petition at the earliest opportunity has deprived Petitioner of the ability to allege the necessary facts in his petition to justify the delay: We will never know how the Superior Court would have ruled had Respondent objected to the timeliness of Petitioner's petition in the Superior Court.

        While Petitioner did not allege specific facts in his petition to justify a delay in filing, his affidavit accompanying his petition discusses his "serious medical problems" relating to liver disease, which required him to be hospitalized "at least eight" times since his incarceration, as well an injury to his shoulder which made his arm practically unusable "for two or three months" during 2007.  Rennie Aff. at ¶¶ 44, 61.  Petitioner claims to have suffered an injury to his hand in 1993 which limits his writing to three pages at most in a day.  *Id.* at ¶ 61.  Additionally, Petitioner makes several allegations regarding the lack of availability of the prison's law library and the difficulty of obtaining counsel considering the out of date attorney directories which were provided therein.  *Id.* at ¶ 67-68.  These statements remain uncontested by Respondent and could substantiate any delay in the filing of Petitioner's Superior Court petition.  For instance, in *In re Nunez* 173 Cal.App.4th 709, 93 Cal.Rptr.3d 242 (2009), the California Court of Appeal accepted as true the petitioner's claim of posttraumatic stress disorder where the respondent did not

challenge petitioner's allegations in the Superior Court.  *Id.* at 723-24.  By failing to provide any

evidence or argument with regard to Petitioner's medical conditions, Respondent "indicates a

willingness to rely on the trial record and the documentary evidence submitted by petitioner as

exhibits to his petition." *Id.*  Accepting *Nunez's* claim of posttraumatic stress disorder as true,

amongst other reasons, the appellate court determined that a ten month delay in filing a habeas

*appeal* was not unreasonable.  *Id.* at 724.  Considering that a ten month delay to file an appeal

was reasonable under the circumstances, it would be reasonable for a petitioner such as the

Petitioner in this case to take nearly a year to attempt to find counsel and draft an initial *pro se*

habeas petition.

      Furthermore, California's reasonable time standard is not clearly defined, making it

difficult to determine what a California court would consider to be an unreasonable delay.  In

*Evans* and *Carey*, the United States Supreme Court likened California's reasonable time standard

to the laws of other states, concluding that a reasonable time to file an appeal from the denial of a

habeas petition was 30 to 60 days.  *Evans*, 546 U.S. at 192-93 (citing *Carey*, 536 U.S. at 219-21);

*id.* at 201.  A review of state laws regarding the amount of time a petitioner is given to file an

initial habeas petition in state court shows that petitioners are often given up to one year after

their conviction becomes final to file a petition.  For instance, in Kansas, a petition for habeas

corpus "must be brought within one year of: (i) The final order of the last appellate court in this

state to exercise jurisdiction on a direct appeal or the termination of such appellate jurisdiction;

or (ii) the denial of a petition for writ of certiorari to the United States supreme court or issuance

of such court's final order following granting such petition." Kan. Stat. Ann. § 60-1507(f).

Washington also places a one-year limit upon collateral attacks of criminal judgments.  *See*

Wash. Rev. Code § 10.73.090 ("No petition or motion for collateral attack on a judgment and

sentence in a criminal case may be filed more than one year after the judgment becomes final.").

A strong majority of the states reviewed by this court permit petitions to be filed within one year

or more.  *See, e.g.*, Pa. R. Crim. P. 901(A) (one year); Utah Code Ann. § 78B-9-106 (one year);

Mont. Code Ann. § 46-21-102 (one year); Or. Rev. Stat. § 138.510(3) (two years); Fla. R. Crim.

P. 3.850(b) (two years in non-capital cases); N.J. Stat. Ann. § 3:22-12 (five years); Mass. R.

Crim. P. 30(a) (allowing petitions to be filed at "any time"); N.C. Gen. Stat. § 15A-1415 (any

time); *but see* Ariz. R. Crim. P. 32.4 (165 days before actual petition is filed, 90 days to file

notice of petition requesting mandatory appointment of counsel).  It is also persuasive that the

federal government has seen fit to provide a one-year statute of limitations for filing a federal

habeas petition.  28 U.S.C. § 2244(d)(1).

Considering the reasonable time standard in California is equally amorphous with regard

to initial petitions as it is to appeals, without more guidance from the California courts it is

reasonable to conclude that a one year delay in filing, which is permitted by most states, would

not be unreasonable under California law.  *See Carey*, 536 U.S. at 222.[7]  As such, Petitioner's

initial state court habeas petitions was timely filed and, therefore, he is entitled to statutory

tolling pursuant to 28 U.S.C. § 2244(d)(2) for the entire time period his habeas claims were being

decided in state court.[8]

B.  After Proper Statutory Tolling, The Federal Petition Was Timely Filed

Even if Petitioner is entitled to statutory tolling for the entire time he was challenging his

conviction through state habeas proceedings, Respondent contends that the present federal

petition is still barred by AEDPA's statute of limitations.  Respondent's argument centers around

---

[7]  "The upshot is that California's collateral review process functions very much like that of other States, but for the fact that its timeliness rule is indeterminate. Other States . . . specify precise time limits, such as 30 or 45 days, within which an appeal must be taken, while California applies a general 'reasonableness' standard.  Still, we do not see how that feature of California law could make a critical difference. . . . We find that California's system functions in ways sufficiently like other state systems of collateral review to bring intervals between a lower court decision and a filing of a new petition in a higher court within the scope of the statutory word 'pending.'"

[8]  Respondent makes no argument that Petitioner's subsequent petitions to the California Court of Appeal and the California Supreme Court were not filed within a "reasonable time."  As such, Petitioner is entitled to tolling of the statute of limitations from the time his petition for habeas corpus was filed in Nevada County Superior Court to the time it was summarily denied by the California Supreme Court.  *See Carey*, 536 U.S. at 220-21; *Nino*, 183 F.3d at 1006.

the date upon which Petitioner's Superior Court habeas petition was filed, arguing that the date listed on the petition, January 12, 2008, is implausible and that the petition must have been filed sometime later than January 16, 2008 (which would make his federal petition untimely), as it was filed with the Superior Court on January 28.  Respondent admits this is merely an "inference," and also attaches to his answer a copy of Petitioner's mail log listing a piece of mail sent to the Nevada County Superior Court on January 25, 2008.  Resp't's Answer at 10, Ex. B.  Petitioner, on the other hand, contends that pursuant to the "mailbox rule," *see Stillman v. LaMarque*, 319 F.3d 1199, 1201 (9th Cir. 2003), his petition was filed on January 12, 2008.

"Under the 'mailbox rule,' a pro se prisoner's filing of a state habeas petition is deemed filed at the moment the prisoner delivers it to prison authorities for forwarding to the clerk of the court." *Stillman*, 319 F.3d at 1201; *see Houston v. Lack*, 487 U.S. 266 (1988) ("[T]he notice of appeal was filed at the time petitioner delivered it to the prison authorities for forwarding to the court clerk."); *see also* Rule 3(d), Federal Rules Governing Section 2254 Cases ("A paper filed by an inmate confined in an institution is timely if deposited in the institution's internal mailing system on or before the last day for filing.").  "When a pro se petition alleges that he timely complied with a procedural deadline by submitting a document to prison authorities, the district court must either accept that allegation as correct or make a factual finding to the contrary upon a sufficient evidentiary showing by the opposing party."  *Faile v. Upjohn Co.*, 988 F.2d 985, 988 (9th Cir. 1993), *disapproved on other grounds in McDowell v. Calderon*, 197 F.3d 1253, 1255 (9th Cir. 1999).

Under the mailbox rule, Petitioner's Superior Court habeas petition was filed on January 12, 2008—the date which he signed the proof of service, declaring under penalty of perjury that he placed the petition in the prison's institutional mailbox on that day.  *See* Lodged Doc. No. 12. It is true that  prison mail logs can be used to rebut the date alleged by petitioners.  In *Houston*, the Supreme Court noted that "prison authorities [] have well-developed procedures for recording the date and time at which they receive papers for mailing and [] can readily dispute a prisoner's

1  assertions that he delivered the paper on a different date" and that "reference to prison mail logs

2  will generally be a straightforward inquiry." 487 U.S. at 275; *see also Price v. Philpot*, 420 F.3d

3  1158, 1165 (10th Cir. 2005) (inmate can establish date he delivered pleading to authorities by

4  showing when it was logged into the prison mail system).  However, the Supreme Court also

5  cautioned that once a prisoner hands his documents to prison officials, he lacks the means to

6  discover any delay in the mailing process. *Houston*, 487 U.S. at 271 ("And if there is a delay the

7  prisoner suspects is attributable to the prison authorities, he is unlikely to have any means of

8  proving it, for his confinement prevents him from monitoring the process sufficiently to

9  distinguish delay on the part of prison authorities from slow mail service or the court clerk's

10 failure to stamp the notice on the date received.").  Respondent has provided no evidence of the

11 reliability of the mail log or shown whether the date indicated on the mail log represents the date

12 the prison received the mail from the prisoner or the date upon which the prison mailed the mail

13 on behalf of the prisoner. *See* Resp't's Answer, Ex. B.  Given that Respondent has failed to

14 produce sufficient evidence from which this court could determine the date which Petitioner gave

15 his petition to prison officials, the date alleged by the petitioner–January 12, 2008–will be

16 accepted as true. *See Faile*, 988 F.2d at 988; *Washington v. United States*, 243 F.3d 1299, 1301

17 (11th Cir. 2001) (burden is on prison authorities to prove the date prisoner gave documents to

18 prison officials and "[a]bsent evidence to the contrary in the form of prison logs or other records,

19 we will assume that [the petitioner's] motion was delivered to prison authorities the day he

20 signed it").

21        Petitioner's conviction became final on January 16, 2007, ninety days after the California

22 Supreme Court denied his petition for direct review.  Lodged Doc. No. 9 (Order Denying

23 Review); *Bowen v. Rowe*, 188 F.3d 1157, 1159 (9th Cir. 1999).  Without any tolling of the

24 statute of limitations, the last day upon which Petitioner could have filed a petition for habeas

25 corpus in federal court was January 16, 2008.  28 U.S.C. § 2244(d)(1).  Four days before his time

26 ran out, on January 12, 2008, petitioner filed a petition for habeas corpus in Nevada County

1  Superior Court, stopping the AEDPA clock.  Lodged Doc. No. 12.  The Superior Court granted

2  in part and denied in part the petition and Petitioner continued through California's habeas

3  process until March 11, 2009, when the California Supreme Court summarily denied his petition

4  for writ of habeas corpus, and the clock started again.  Lodged Doc. No. 15.  One day later, on

5  March 12, 2009, with only a few days remaining before AEDPA's statute of limitations barred

6  Petitioner's federal petition, Petitioner filed the instant petition for writ of habeas corpus in

7  United States District Court.  Pet'r's Pet., ECF No. 2.  As such, the petition is not barred by

8  AEDPA's statute of limitations.[9]

9              V.  ANALYSIS OF PETITIONER'S CLAIMS

10      A.  Claim I – Speedy Trial

11          In Claim I, Petitioner argues the nearly eight year delay between the time the information

12  was filed and Petitioner was brought to trial violates his right to a speedy trial under the Sixth

13  Amendment as applied to the states through the Fourteenth Amendment.  Specifically, Petitioner

14  asserts that the California courts unreasonably applied the United States Supreme Court's

15  holdings in *Barker v. Wingo*, 407 U.S. 514 (1972), and *Doggett v. United States*, 505 U.S. 647

16  (1992), to find that Petitioner's right to a speedy trial was not violated.

17      1.  State Court Decisions

18          The last reasoned state court decision is the denial of Petitioner's petition for habeas

19  corpus in Nevada County Superior Court.  In the Superior Court's ruling, made from the bench

20  after a hearing on the petition, the court stated as follows:

21              With respect to the issue of speedy trial, I think that the People
                have the high ground on the generic speedy trial issue, which I'll
22              break it down as I've described in my questioning with you, Ms.
                Radekin [Petitioner's counsel].  I think there, the fact that Mr.
23              Rennie absented himself from the trial, and I'm not seeing
                evidence of sufficient prejudice there shown. . . .

24

25      ───────────────

26      [9]  Because Petitioner is entitled to statutory tolling of the limitations period which brings
        his petition within the statute of limitations, it is unnecessary to consider whether petitioner is
        also entitled to equitable tolling.

                                          16

> There was no 1389[10] demand filed which would have triggered his trial rights down here . . . . So I think on the generic speedy trial issue, I think the people have the high ground. And I deny any relief on that basis.

Lodged Doc. No. 10, at 32-33.

Because the Superior Court ruled from the bench, without explaining its reasoning in great detail, the California Court of Appeal's analysis on this issue is also instructive:[11]

> A complaint was filed in this case June 1997 and an information was filed in August, 1997, but trial did not begin until March 2005, in large part because defendant was incarcerated in Oregon during the interim. Defendant asserted this delay violated his constitutional right to a speedy trial and he filed motions to dismiss his case in March 2004, December 2004, and March 2005. The trial court denied each motion.

> On appeal, defendant reiterates his claim that this lengthy delay violated constitutional guarantees to a speedy trial. In essence, he contends that the delay was attributable to the prosecution, who failed to seek defendant's transfer from Oregon to California to stand trial. Proper analysis compels a contrary conclusion.

> Initially, we note that although defendant makes fleeting reference to the right to a speedy trial guaranteed by article 1, section 15 of the California Constitution, he focuses his arguments exclusively on rights under the federal constitution. Our discussion is therefore likewise limited.

> In *Barker v. Wingo* (1972) 407 U.S. 514 [33 L.Ed.2d 101], the

---

[10]  This is a reference to California Penal Code section 1389, which is California's codification of the Interstate Agreement on Detainers (IAD). Under the process set forth therein, a state seeking to prosecute a defendant who is presently incarcerated in another state may file a detainer. Once the detainer is filed, either the state or the defendant can make a request that the defendant be transferred for prosecution. *See New York v. Hill*, 528 U.S. 110, 111-12 (2000). "After a detainer has been lodged against him, a prisoner may file a 'request for a final disposition to be made of the indictment, information, or complaint.' Art. III(a). Upon such a request, the prisoner 'shall be brought to trial within on hundred eighty days,'" which may be continued for good cause. *Id.* at 112 .

[11]  Pursuant to *Barker v. Fleming*, this court's review is limited to the state courts' last reasoned decision, in this case the ruling of the Nevada County Superior Court on Petitioner's petition for writ of habeas corpus. 423 F.3d at 1092-93 ("even when one state court adhered to federal law, if the last court to review the claim erred, the federal court should review the last decision in isolation and not combination with decisions by other state courts"). However, the court finds the California Court of Appeal's decision helpful in discussing the factors as applied and focused on by the Superior Court.

United States Supreme Court adopted a balancing test for analyzing speedy trial cases under the Sixth Amendment, requiring courts to consider the conduct of both the prosecution and the defendant.  Among the factors to be assessed are the length of delay, the reason for the delay, the defendant's assertion of his right, and the prejudice to the defendant. (407 U.S. at p. 530 [33 L.Ed.2d at pp. 116-117].)  None of these factors has "talismanic qualities" (407 U.S. at p. 533 [33 L.Ed.2d at p. 118]), and none is a necessary or sufficient condition to finding a deprivation of the right to speedy trial.  (*Ibid.*)  "Rather, they are related factors and must be considered together with such other circumstances as may be relevant."  (*Ibid.*)

We examine each factor in turn.

The first factor, length of the delay, serves as a triggering mechanism for further analysis.  "Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance."  (*Barker v. Wingo*, *supra*, 407 U.S. at p. 530 [33 L.Ed.2d at p. 117].)

Here, there is no question that a significant delay occurred.  An information was filed in 1997, but little happened to prosecute the case until 2004 and trial did not actually begin until 2005.  Contrary to defendant's suggestions, this lengthy delay does not in itself require dismissal.  It simply moves our analysis past the threshold question and on to a discussion of the other relevant factors.  (*Barker v. Wingo*, *supra*, 407 U.S. at p. 530 [33 L.Ed.2d at p. 117]; see also *Doggett v. United States* (1992) 505 U.S. 647, 655-56 [120 L.Ed.2d 520, 531]; *United States v. Graham* (6th Cir. 1997) 128 F.3d 372, 374.)

We next examine the reason for the delay in prosecution.  The basic reason is obvious: defendant was incarcerated in Oregon during much of the relevant period.  Neither the prosecutor nor defendant sought to transfer defendant to California under articles III or IV of the Interstate Agreement on Detainers (§ 1389).  Defendant asserts the prosecution deliberately failed to seek extradition to stand trial in California in order to deprive him of the possibility of concurrent sentencing on the Oregon and California offenses.  This theory has no basis in fact.  As the trial court aptly noted, there was no evidence of bad faith on the part of the prosecutor, and there was virtually no likelihood of concurrent sentences for completely unrelated crimes.  The prosecution's failure to seek a transfer stemmed, at worst, from neglect, and does not weigh as heavily against the government as a deliberate attempt to delay trial.  (*Barker v. Wingo*, *supra*, 407 U.S. at p. 531 [33 L.Ed.2d at p. 117].)

/ / /
/ / /

18

The third factor, defendant's assertion of his right to a speedy trial, weighs strongly against defendant.  Defendant did not raise his claim until March 2004, more than six years after the filing of the information.  Defendant asserts that "[l]ack of assertion of the right to a speedy trial is only of minor importance in a Sixth Amendment claim and assertion is not required."  To the contrary, "the defendant's assertion of his speedy trial right . . . is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right.  We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial."  (*Barker v. Wingo*, *supra*, 407 U.S. at p. 531-532 [33 L.Ed.2d at p. 117-118].)

Defendant's claim is further complicated by the fact that some of the delay can be attributed directly to defendant's own conduct.  In the early stages of this case, in 1997 and 1998, defendant repeatedly waived time for trial.  He did so again in June 2004 and September 2004, as trial approached.  Defendant sought and received continuances (twice over the prosecution's objections) in September 2004, December 2004, and January 2005, postponing trial until March 2005.  Whether these motions are viewed as reasons for the delay or as additional evidence of defendant's less-than-urgent interest in a speedy trial, the logical conclusion is the same: defendant bears much of the responsibility for the delay.  (See *People v. Anderson* (2001) 25 Cal.4th 543, 604.)

Finally, defendant cannot demonstrate prejudice.  Defendant was already incarcerated on other, unrelated, charges during this period of time.  (See *Barker v. Wingo*, *supra*, 407 U.S. at p. 532 [33 L.Ed.2d at p. 118] [right to speedy trial is intended, in part, to prevent oppressive pretrial incarceration].)  In contrast to the situation in cases relied upon by defendant, such as *Doggett v. United States*, *supra*, 505 U.S. at pages 652-654 [120 L.Ed.2d at p. 529] and *Stabio v. Superior Court* (1994) Cal.App.4th 1488, 1491, 1493-1494, defendant knew of the pending charges and was not caught unaware.

Here, the passage of time generally worked in defendant's favor.  The memories of the prosecution witnesses had dimmed, and defendant used these inconsistencies and failures of recollection to his advantage at trial.  "Delay is not an uncommon defense tactic.  As the time between the commission of the crime and the trial lengthens, witnesses may become unavailable or their memories may fade.  If the witnesses support the prosecution, its case will be weakened, sometimes seriously so."  (*Barker v. Wingo*, *supra*, 407 U.S. at p. 521 [33 L.Ed.2d at p. 111].)

Defendant argues that one of his witnesses, John Rizzo, died during this period of time, depriving him of the opportunity to present evidence about his whereabouts on one of the nights in question.  Defendant contacted Rizzo shortly after he learned about

1    the victims' accusations, but never obtained a declaration from
     Rizzo or otherwise preserved Rizzo's proposed testimony.
2    Defendant therefore shoulders at least some of the blame for any
     prejudice resulting from Rizzo's death.  More importantly, even if
3    Rizzo gave defendant a ride from the victims' house to a motel late
     on the night of November 10, 1996, the fact is of minimal, if any,
4    probative value.  It would not disprove the victims' claims about
     defendant's conduct, which would have occurred before defendant
5    left their house.

6    In sum, an analysis of the relevant factors leads to one inescapable
     conclusion: defendant's rights to a speedy trial were not violated.

7

8    Slip Op. at 1- 3.

9              2.  Legal Standard for Speedy Trial Claims

10         The Sixth Amendment provides, in part: "In all criminal prosecutions, the accused shall

11   enjoy the right to a speedy and public trial."  U.S. Const. amend. VI.  In interpreting this

12   Amendment, the Supreme Court has rejected rigid timing requirements and has instead adopted a

13   balancing test which "compels courts to approach speedy trial cases on an ad hoc basis."  *Barker*,

14   407 U.S. at 530 ("We cannot definitely say how long is too long in a system where justice is

15   supposed to be swift but deliberate.").  In *Barker v. Wingo*, the Court identified "some of the

16   factors which courts should assess in determining whether a particular defendant has been

17   deprived of his right," including: (1) length of delay; (2) reasons for the delay; (3) the defendant's

18   assertion of his right; and (4) prejudice to the defendant.  *Id.*  The court emphasized that the

19   factors do not have "talismanic qualities" and that no single factor is a "necessary or sufficient

20   condition to the finding of a depravation of the right of speedy trial."  *Id.* at 533.  "Courts must

21   still engage in a difficult and sensitive balancing process."  *Id.* (footnotes omitted).

22             3.  The Superior Court's Denial Is Objectively Reasonable

23         Each *Barker* factor is discussed in turn.

24         The Superior Court did not directly address the issue of the length of delay.  However,

25   implicit in the court's analysis is a finding that Petitioner had suffered a long enough delay that it

26   was presumptively prejudicial.   The first factor, length of delay, "is to some extent a triggering

                                      20

mechanism" for the speedy trial analysis. *Id.* "Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Id.* Because the court addressed at least some of the other *Barker* factors, it is safe to assume that the court found the delay presumptively prejudicial. *See Doggett*, 505 U.S. at fn. 1 ("Depending on the nature of the charges, the lower courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year.").

The inquiry is not only a threshold matter, however. Once the *Barker* analysis has been triggered by a finding of presumptive prejudice, the length of delay is one factor to be considered in the balance. *See id.* at 651-52. "[T]he presumption that pretrial delay has prejudiced the accused intensifies over time." *Doggett*, 505 U.S. at 652 ("[E]xcessive delay presumptively compromises the reliability of a trial in ways that neither party can prove, or, for that matter, identify."). The amount of prejudice to be presumed depends somewhat on the reason for the delay: for instance, if the prosecution creates the delay in bad-faith a large amount of prejudice is presumed to result. *See id.* at 656-57 (discussing the variations between diligent prosecution, bad-faith delay, and official negligence and their affect upon the presumptive prejudice determination). Thus, the amount of prejudice to presume in this case can only be determined after discussing *Barker*'s second factor: the reason for the delay.

The Superior Court did not directly address the reason for the delay in its ruling from the bench. "A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighed less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Barker*, 407 U.S. at 531. Petitioner does not allege, and there is no evidence from which it could be concluded, that the prosecution's actions in this case amounted to bad-faith. Nevertheless, "[a] defendant has no duty to bring himself to trial; the State has that duty." *Id.* at 527; *see also id.* at 529 ("plac[ing] the primary burden on the courts and the prosecutors to assure

that cases are brought to trial."); *Moore v. Arizona*, 414 U.S. 25, 26 (1973) (state has a "constitutional duty" to make a diligent, good-faith effort to bring defendants to trial (*quoting Smith v. Hooey*, 393 U.S. 374, 383 (1969)); *Dickey v. Florida*, 398 U.S. 30, 38 (1970) ("[T]he right to a prompt inquiry into criminal charges is fundamental and the duty of the charging authority is to provide a prompt trial.").   Some of the delay, particularly before Petitioner was incarcerated in Oregon as well as the time for which Petitioner sought continuances of his trial in 2004, is attributable to Petitioner.  While either party could have placed the trial in motion during Petitioner's incarceration in Oregon under the Interstate Agreement on Detainers, the nearly six year gap in the prosecution of the case is attributable to the State's lack of diligence, if not negligence, in bringing Petitioner to trial.  *See Doggett*, 505 U.S. at 652-53.

Taking the reason for the delay and the length of the delay together, these factors likely favor Petitioner.  For six of the nearly eight years between the time the information was filed and Petitioner was finally brought to trial, the prosecution made no attempt to move the case forward.  However, the additional delay is attributable to Petitioner.  After the six year delay, the Petitioner moved to continue the trial on three separate occasions in order to further investigate the underlying facts of the case.  At least one of these motions was opposed by the prosecution.  In *Doggett*, the Supreme Court found that the presumed prejudice from a six year delay due to the prosecution's neglect was enough to warrant relief for violation of the defendant's right to a speedy trial, 505 U.S. at 658.  Here, six years of the delay is equally the result of the negligence of the prosecution.  The first two factors of the *Barker* analysis, taken together, weigh in favor of Petitioner.

Unlike *Doggett*, however, the third *Barker* factor, the assertion of the right to a speedy trial, weighs heavily against Petitioner's speedy trial claim.  In *Doggett*, the defendant was never aware of the pending criminal charges against him during the six year delay and, as such, could not have possibly asserted his right to a speedy trial during that time.  The Court noted that had the defendant known of his indictment during the delay in his prosecution, "*Barker*'s third factor,

1  concerning invocation of the right to a speedy trial, would be weighed heavily against him." *Id.*

2  at 653.  While the Supreme Court rejected a rigid "demand requirement" in *Barker*, the failure to

3  assert the right to a speedy trial is still "entitled to strong evidentiary weight in determining

4  whether the defendant is being deprived of the right." *Barker*, 407 U.S. at 531-32, 528 ("We

5  emphasize that failure to assert the right will make it difficult for a defendant to prove that he

6  was denied a speedy trial.").  Here, there is no question that Petitioner knew of the charges

7  against him in Nevada County, yet he did little, if anything, to assert his right to a speedy trial for

8  approximately six and one-half years.  Petitioner was aware of his right under article III of the

9  Interstate Agreement on Detainers to force the prosecution to try him or dismiss the charges, yet,

10 pursuant to the advice of his counsel and as the Superior Court aptly pointed out in its decision,

11 he never filed such documents.  *See* Munkelt Delc. at ¶ 5; Rennie Aff. at ¶ 10-11.

12     The final factor in the *Barker* analysis is the actual prejudice to the defendant.  *Id.* at 532.

13 Establishing actual prejudice is not a prerequisite to relief, it is one factor to be weighed in the

14 *Barker* balancing test.  *See Doggett*, 505 U.S. at 654-56 ("[A]ffirmative proof of particularized

15 prejudice is not essential to every speedy trial claim.").  Prejudice is assessed in light of the

16 interests the speedy trial right was designed to protect.  *Id.*  The Court identified three particular

17 interests: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of

18 the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker*, 404 U.S.

19 at 532. (footnote omitted); *see also United States v. Ewell*, 383 U.S. 116, 120 (1966).  "Of these,

20 the most serious is the last, because the inability of a defendant adequately to prepare his case

21 skews the fairness of the entire system." *Barker*, 404 U.S. at 532.

22     Considering Petitioner was incarcerated in Oregon for the majority of the time he was

23 awaiting trial in California, he suffered little oppressive pretrial incarceration.  *See id.* at 532-33

24 (discussing the disadvantages of not only pre-trial incarceration but also those faced by an

25 accused free on bail); *Klopfer v. North Carolina*, 386 U.S. 213, 221-22 (1967); *but see Smith*,

26 393 U.S. at 378 (discussing the types of oppressive pretrial incarceration a person in prison

pursuant to a lawful conviction may suffer, including a lengthier incarceration and more restricted prison conditions).  Petitioner does assert that the detainer lodged against him prevented him from being placed on minimum security status, though later in the same document he suggests other reasons, apart from anything related to the California case, as to why his status was increased requiring him to be held in a more restrictive facility.  Rennie Aff. at ¶¶ 10, 54-59.  While this may show Petitioner suffered some form of pre-trial incarceration which should be taken into account in determining prejudice, the weight given to such prejudice must be less than which would be afforded to a person held in jail awaiting trial who has not been convicted of any crime.

Petitioner does contend, however, that he suffered anxiety regarding his pending California criminal charges while he was incarcerated in Oregon and that the lengthy delay prejudiced his defense due to the death of a possible alibi witness and the fading memories of the prosecution's key witnesses–who were children at the time of Petitioner's arrest but adults by the time he was actually tried.

In *Smith*, the United States Supreme Court found that "there is reason to believe that an outstanding untried charge (of which even a convict may, of course, be innocent) can have fully as depressive an effect upon a prisoner as upon a person who is at large." 393 U.S. at 379.  The Court relied on the opinion of the former Director of the Federal Bureau of Prisons that "[t]he strain of having to serve a sentence with the uncertain prospect of being taken into the custody of another state at the conclusion interferes with the prisoner's ability to take maximum advantage of his institutional opportunities.  His anxiety and depression may leave him with little inclination toward self-improvement." *Id.* (footnote omitted).  Petitioner alleges that he did suffer anxiety as a result of the pending charges while he was incarcerated in Oregon. "[H]aving this matter still pending continually caused me considerable anxiety, due to not knowing when, or if, the matter would ever be dismissed, not knowing for certain if I would be released when my sentence expired, not knowing if I might have to serve additional time in California, and not

being able to make firm plans for my release." Rennie Aff. at ¶ 10.   As such, this portion of the prejudice analysis also favors the Petitioner, though how much weight should be given in an admittedly difficult balancing process is difficult to quantify.  *See Barker*, 407 U.S. at 533-34.  In *Barker* the Court found that even though the defendant had "liv[ed] for over four years under a cloud of suspicion and anxiety" the "prejudice was minimal."  *Id.* at 534.

The last interest in the prejudice analysis is the possibility that Petitioner's defense was impaired.  "[D]eprivation of the right to a speedy trial does not per se prejudice the accused's ability to defend himself."  *Id.* at 521.  In fact, unlike other constitutional rights, deprivation of the right to a speedy trial "may work to the accused's advantage."  *Id.*  This especially true considering that delay is a common tactic employed by defendants.  As delay increases, witnesses' memories fade and, if the witnesses support the prosecution, its case could be seriously weakened.  *Id.*  However, if witnesses for the defense become unavailable due to the passage of time, a defendant's ability to defend himself can be placed in serious jeopardy.  The fading memory of witnesses is especially crucial in cases where the nature of the charges are such that they are most likely proved through testimonial evidence.  *See McNeely v. Blanas*, 336 F.3d 822, 832 (9th Cir. 2003) (finding the defense to be hindered on charges similar to those faced by Petitioner).

It is likely that the memories of the witnesses who testified for the prosecution at Petitioner's trial had faded since the time the crimes occurred.  Kimberly R. was born in 1983, making her twelve years old at the time of the crimes.   Lodged Doc. No. 1 (Reporter's Transcript on Appeal) (hereinafter "Tr.") at 162, 174.  By the time she testified at trial, Kimberly was twenty years old.  On direct examination Kimberly did not remember many of the surrounding circumstances regarding the crimes and their investigation, even after her memory was refreshed by looking at the transcript of her previous testimony (presumptively from the preliminary hearing).  *Id.* at 171-75.  She did, however, remember in detail the events of November 10, 1996, when Petitioner came into her room, removed her pants, and licked her vagina.  *Id.* at 164-66,

1   169.  Petitioner's counsel had ample opportunity to cross-examine Kimberly and raise any issue

2   regarding the credibility of her testimony due to passage of time.  It was on cross-examination

3   that Kimberly said, when asked how many occasions Petitioner had licked her vagina, that she

4   "couldn't count that high," and Petitioner's counsel used her testimony from the preliminary

5   hearing that it had only happened twice, and from her reports to a deputy sheriff that it had

6   happened five times, to question her credibility.  *Id.* at 185-86, 195.  Petitioner's counsel used

7   Kimberly's previous testimony from the preliminary hearing to impeach large portions of her

8   trial testimony.  *Id.* at 189-99.

9        Despite the fact witnesses' memories had faded due to the delay in Petitioner's trial, the

10   Superior Court concluded, as had the California Court of Appeal before it, Petitioner had not

11   suffered prejudice.  Petitioner's argument centers largely around the inconsistent testimony of

12   prosecution witnesses.  But, it is a reasonable conclusion that here the passage of time in fact

13   benefitted Petitioner.  *See Barker*, 407 U.S. at 521.  By creating inconsistencies in the testimony

14   of prosecution witnesses, Petitioner's counsel had an opportunity to place reasonable doubt in the

15   mind of the jury.  The jury, however, found otherwise.

16        Petitioner also contends that he was prejudiced because a possible defense witness, John

17   Rizzo, died in 1998 during the delay in Petitioner's trial.  Petitioner alleges that Rizzo would

18   have provided an alibi, testifying that Petitioner was with him five miles away from the victims'

19   home when the crimes occurred.  Rennie Aff. at ¶ 30.  Unfortunately, we have nothing to go by

20   but the Petitioner's own statement as to the content of Rizzo's testimony as Petitoner never

21   obtained a declaration from Rizzo or otherwise preserved Rizzo's testimony.  Furthermore, as the

22   Court of Appeal noted, Rizzo's proposed testimony, if accepted as true, may not have proved that

23   Petitioner was not in fact present at the victims' home earlier that night with the opportunity to

24   commit the crime.  The fact that Petitioner was unable to call a possible defense witness at his

25   trial may have prejudiced his defense.  Petitioner, however, cannot prove that he suffered actual

26   prejudice as a result of Rizzo's death.

In *Doggett*, the Court concluded that a six year delay caused by the negligence of the prosecution was enough to violate the defendant's right to a speedy trial.  505 U.S. at 658.  "When the Government's negligence thus causes delay six times as long as that generally sufficient to trigger judicial review, and when the presumption of prejudice, albeit unspecified, is neither extenuated, as by defendant's acquiescence, nor persuasively rebutted, the defendant is entitled to relief."  *Id.* (citations and footnotes omitted).  However, in this case some of the factors weigh differently than they did in *Doggett*.  Specifically, with regard to *Barker*'s third factor, concerning invocation of the right to a speedy trial, the Court found that if Doggett had been aware of his indictment this factor "would be weighed heavily against him."  *Id.* at 653; *see Barker*, 407 U.S. at 532 ("We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial.").  Here, Petitioner was aware of the pending charges and had the ability to force the prosecution to either try him promptly or dismiss the charges, yet did not assert his right to a speedy trial until he filed a motion to dismiss in 2004.

The Nevada County Superior Court's determination that Petitioner's right to a speedy trial had not been violated is not objectively unreasonable.  The fact that Petitioner was not brought to trial for nearly eight years, including a six year period in which the prosecution did nothing to move the trial forward, creates a strong presumption of prejudice to Petitioner.  However, this court does not review the Petitioner's claims *de novo*.  "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."  *Schriro*, 550 U.S. at 473, *citing Williams*, 529 U.S. at 410.

B.  Claim II – Ineffective Assistance of Counsel

In Claim II, Petitioner challenges the Superior Court's determination that Petitioner was not prejudiced by his counsel's substandard performance.  Petitioner contends that his trial counsel's failure to send a confirming letter to the prosecution regarding the prosecution's statement that they intended to dismiss the charges constituted ineffective assistance of counsel

1   as it prejudicially affected the outcome of his trial.  Because Petitioner cannot show that the

2   charges would, in fact, have been dismissed, either voluntarily by the prosecution or on speedy

3   trial grounds, Petitioner's claim must fail.

4       As with Petitioner's speedy trial claim, the last reasoned decision regarding Petitioner's

5   ineffective assistance of counsel claim is the ruling of the Nevada County Superior Court on

6   Petitioner's state petition for habeas corpus.  The court stated as follows:

> Here this question about the no confirming letter is the one that
> intrigues me.  I'm an old civil lawyer.  Our stock and trade is "this
> letter confirms our conversation of X, Y, Z day where you said A,
> B, C.  And in reliance on that I'm either doing or not doing what
> I'm doing."  So maybe this is some of my bias based on roughly 20
> years of civil work before they gave me this job.  But I do think it
> falls below the standard of care, although there's no case on point
> that I've seen on that point.
>
> I have no evidence in the record to refute Mr. Munkelt's statement
> that then Deputy DA McManus made these statements [that the
> charges would be dismissed] to him.  And I have no evidence to
> controvert Mr. Munkelt's testimony by declaration that he
> conferred all of that information on his client and recommended to
> his client that he not proceed with a 1389 demand in reliance on
> that information.  What's absent here is notice to the District
> Attorney's office that that's what he's doing.  And here I think
> there's a difference between informal communication between
> counsel, walking down the hall shooting the breeze about cases,
> and formal communication that says you told me X.  Because of
> that I'm either doing X or not doing Z.  Okay.  Which then creates
> that estoppel on the person who makes their representation.
>
> There's nothing in this record that indicates that that was
> communicated back to the People in that fashion.  And I think
> because of that your estoppel argument dies right there as a legal
> proposition.  That the estoppel generally requires the person being
> estopped to either know or reasonably appreciate that the other
> person is either doing something or failing to do something in
> reliance upon the representation.  That's not here.  And the letter
> years later to Mr. O'Rourke doesn't resurrect it at that time.  It
> raises the question what about 2001 on.  But then that's a whole
> different kettle of fish than from '98 to 2001 in this court's view.
>
> So the precise argument is, or precise analysis is this court would
> conclude that Mr. Munkelt's activities were below the standard of
> care as described in the failure either to beat the hornets nest with
> the appropriate filing, or communicate to the People that I'm not
> beating the hornets next and here's why.  Because you said this to

1    me.  To set up the estoppel that would have benefitted Mr. Rennie.
     But that because he didn't do that, that doesn't –that doesn't get
2    created.

3    So the IAC is really the failure to create the estoppel.  Which just
     leads us back to the generic speedy trial and the denial of the
4    generic speedy trial argument, okay.  So I don't find that
     ineffective assistance of counsel is a ground for relief here, either
5    at the trial level or at the appellate level on this writ, even though I
     do find that Mr. Munkelt's conduct had been below the standard of
6    care.

7    Lodged Doc. No. 10 (Writ of Habeas Corpus Transcript of Proceeding).

8          The Sixth Amendment guarantees effective assistance of counsel.  In *Strickland v.*

9    *Washington*, 466 U.S. 668 (1984), the Supreme Court articulated the test for demonstrating

10   ineffective assistance of counsel.  First, the petitioner must show that considering all the

11   circumstances, counsel's performance fell below an objective standard of reasonableness.  *See id.*

12   at 688.  Petitioner must identify the acts or omissions that are alleged not to have been the result

13   of reasonable professional judgment.  *See id.* at 690.  The federal court must then determine

14   whether in light of all the circumstances, the identified acts or omissions were outside the range

15   of professional competent assistance.  *See id.*

16         Second, a petitioner must affirmatively prove prejudice.  *See id.* at 693.  Prejudice is

17   found where "there is a reasonable probability that, but for counsel's unprofessional errors, the

18   result of the proceeding would have been different."  *Id.* at 694.  A reasonable probability is "a

19   probability sufficient to undermine the confidence in the outcome."  *Id.*  A reviewing court "need

20   not determine whether counsel's performance was deficient before examining the prejudice

21   suffered by defendant as a result of the alleged deficiencies . . . [i]f it is easier to dispose of an

22   ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be

23   followed."  *Pizzuto v. Arave*, 280 F.3d 949, 955 (9th Cir. 2002) (citing *Strickland*, 466 U.S. at

24   697).  "When § 2254(d) applies," as it does here, "the question is not whether counsel's actions

25   were reasonable.  The question is whether there is any reasonable argument that counsel satisfied

26   *Strickland*'s deferential standard."  *Id.*

1    Petitioner's alleges that had his trial counsel, Stephen Munkelt, sent a letter to Julie

2    McManus, the Deputy District Attorney in charge of Petitioner's case at that time, confirming her

3    statement that she intended to dismiss the charges, it is reasonably possible that the case would

4    have been dismissed by the prosecution.  *See* Pet'r's Pet., ECF No. 2, at 6.  Even if the

5    prosecution did not dismiss the case, Petitioner argues that a confirmatory letter would have

6    bolstered his argument that his right to a speedy trial had been violated, requiring dismissal.

7    Petitioner cannot show that had a confirming letter been sent, the prosecution would have

8    dismissed the charges.  Petitioner acknowledges that McManus' statement that she intended to

9    dismiss the charges was not binding on the prosecution and that the District Attorney's Office

10   was free to change its mind and prosecute Petitioner.  *See* Pet'r's Pet., Docket No. 2, at 61-62.  If

11   such a letter was sent, the District Attorney may have brought Petitioner to trial immediately.

12   One reason why a confirming letter may not have been sent is that Petitioner's counsel wanted to

13   avoid this outcome, believing that delay improved the chances of the case actually being

14   dismissed.  Petitioner cannot show prejudice on this basis because he cannot show that had a

15   confirmatory letter been sent the result of the proceeding would have been different.  *Strickland*,

16   466 U.S. at 694.

17   Equally unavailing is Petitioner's claim that had a confirmatory letter been sent his

18   speedy trial claim would have been successful.  Petitioner argues that such a letter would prove

19   that the reason for the delay, prong two of the *Barker* analysis, rested squarely on the

20   prosecution's shoulders.  *See* Claim I, *supra*.  As with Petitioner's first contention, there is no

21   guarantee that had a confirmatory letter been sent, the amount of delay would have remained the

22   same.  Even assuming that such a letter would have had no effect upon the length of delay in

23   Petitioner's trial, it would not effect the outcome of Petitioner's speedy trial claim.  As discussed

24   above in Claim I, the reason for the delay, even without a confirmatory letter, weighs against the

25   prosecution.  Petitioner's speedy trial claim is unsuccessful because he did not assert his right to

26   a speedy trial, making *Barker*'s third factor "weigh heavily" against him.  *Doggett*, 505 U.S. at

1  653.  As with the second factor, the analysis in Claim I of *Barker*'s third factor would not be

2  altered had Petitioner's counsel sent a confirmatory letter because the letter would have done

3  nothing to assert Petitioner's right to a speedy trial.  In sum, had Petitioner's counsel sent a letter

4  to Deputy District Attorney McManus confirming McManus' intent to dismiss the charges

5  against Petitioner, it would have no effect upon Petitioner's speedy trial claim.  As such, the

6  Superior Court's determination that Petitioner cannot show that he was prejudiced by counsel's

7  actions is reasonable and Petitioner is not entitled to relief on this claim.

8                                                VI.  CONCLUSION

9             For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that the petition for

10  writ of habeas corpus be DENIED.

11             These findings and recommendations are submitted to the United States District Judge

12  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

13  after being served with these findings and recommendations, any party may file written

14  objections with the court and serve a copy on all parties.  Such a document should be captioned

15  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

16  shall be served and filed within seven days after service of the objections.  The parties are

17  advised that failure to file objections within the specified time may waive the right to appeal the

18  District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In any objections he

19  elects to file, Petitioner may address whether a certificate of appealability should issue in the

20  event he elects to file an appeal from the judgment in this case.  *See* Rule 11, Federal Rules

21  Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability

22  when it enters a final order adverse to the applicant).

23  DATED:  September 7, 2011

24

25                                                              _____

26                                                              TIMOTHY J BOMMER
                                                                UNITED STATES MAGISTRATE JUDGE